**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **US FOODS, INC.,** a Delaware corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| **BI-RITE RESTAURANT SUPPLY CO., INC.** | ) | |
| **(doing business as BIRITE FOODSERVICE** | ) | |
| **DISTRIBUTORS)**, a California company; | ) | |
| **JOHN WENDT**, an individual; | ) | |
| **KEVIN CONLEY**, an individual; | ) | |
| **MITCHELL HUGHES**, an individual; | ) | **JURY DEMAND REQUESTED** |
| **MICHAEL MOSQUEIRA**, an individual; | ) | |
| **RICHARD POWELL**, an individual; and | ) | |
| **TIMOTHY KENNEDY**, an individual, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff US FOODS, INC. ("USF"), for its Complaint for Injunctive and Other Relief

against Defendants BI-RITE RESTAURANT SUPPLY CO., INC. (doing business as BIRITE

FOODSERVICE DISTRIBUTORS) ("BiRite"), JOHN WENDT ("Wendt"), KEVIN CONLEY

("Conley"), MITCHELL HUGHES ("Hughes"), MICHAEL MOSQUEIRA ("Mosqueira"),

RICHARD POWELL ("Powell"), and TIMOTHY KENNEDY ("Kennedy"),[1] states as follows:

### INTRODUCTION

1.      This cases arises from Defendants' coordinated scheme to usurp USF's business

and misappropriate its confidential, proprietary, and/or trade secret information.  For several

---

[1] Wendt, Conley, Hughes, Mosqueira, Powell, and Kennedy are collectively referred to as the
"Individual Defendants."  The Individual Defendants and BiRite are collectively referred to as
the "Defendants."

years, the Individual Defendants were employed as sales representatives for USF. As such, they were responsible for servicing approximately 188 USF customers. Those customers generated over $19 million in sales for USF in 2013.

2.       In just the last few months, BiRite has hired at least six (6) former USF employees, including one (1) District Sales Manager ("DSM"), and five (5) Territory Managers ("TM"), who now hold nearly identical positions at BiRite — one of USF's direct competitors.

3.       BiRite has deliberately targeted those USF employees from whom it believes it can leverage the most USF confidential, proprietary, and/or trade secret information in order to jump-start its expansion and increase revenues. The Individual Defendants left USF in coordinated fashion on two separate dates. Wendt, Conley, and Kennedy resigned on January 25, 2014. Hughes, Mosqueira, and Powell resigned on February 28, 2014. However, all of them had decided to leave USF and join BiRite well before those dates. Prior to resigning from USF, the Individual Defendants created a plan to transfer the customers they serviced on behalf of USF to their new employer, BiRite. In order to accomplish this plan, they began to secretly misappropriate USF's property, including its confidential, proprietary, and/or trade secret information.

4.       The Individual Defendants' simultaneous and immediate resignations, without notice, were coordinated and designed to maximize the harm to USF by effectively preventing USF from continuing to service the customers to which the Individual Defendants had been assigned. One way in which the Individual Defendants accomplished this goal was by deleting USF's critical ordering, delivery and contact information for those customers. While USF struggled to piece this information together after the Individual Defendants' departure, the Individual Defendants began, in violation of their contractual obligations, to systematically and

brazenly solicit USF's customers on behalf of BiRite, while aided by USF's confidential, proprietary, and/or trade secret information. Although BiRite was aware that these activities were wrongful and prohibited by the Individual Defendants' contracts with USF, BiRite facilitated and encouraged them.

5. Over the next few months, USF gradually learned of the scope and effect of the Defendants' wrongful conduct by visiting and speaking to the affected customers, and by conducting their own internal investigation. USF's investigation has revealed that the Individual Defendants took, without permission or authorization, USF property containing confidential, proprietary, and/or trade secret information concerning its customers. This property was never returned by any of the Individual Defendants despite repeated requests, and has been used to unlawfully solicit USF's customers.

6. In likely the most egregious example of the Individual Defendants' wrongful taking and retention of USF property, Defendants Hughes and Mosqueira executed a coordinated scheme to steal USF property. During the weeks leading up to their simultaneous resignations on February 28, 2014, and with increasing frequency as their resignations neared, both Hughes and Mosqueira e-mailed hundreds of USF documents containing USF confidential, proprietary, and/or trade secret information regarding nearly every customer they serviced on behalf of USF to their personal e-mail addresses. Armed with this information, the Individual Defendants had a virtual roadmap to solicit USF's customers and displace USF from such business.

7. USF repeatedly sent cease and desist letters to the Individual Defendants and BiRite reminding them of the Individual Defendants' contractual obligations and USF's legal rights. Defendants were undeterred. They have refused to acknowledge their wrongful activities, continue to maintain USF's property, including its confidential, proprietary, and/or

trade secret information, and continue to unlawfully interfere with USF's relationship with its customers, causing extensive damage to USF's business and customer relationships, and necessitating injunctive relief.

8.       USF now seeks to enjoin the Individual Defendants from breaching their Non-Solicitation and Non-Disclosure Agreements with USF and impermissibly using USF's confidential, proprietary, and/or trade secret information to solicit USF's customers.  USF also seeks to enjoin Defendants from misappropriating or threatening to misappropriate, and from disclosing and/or using, USF's confidential, proprietary and/or trade secret information and seeks the immediate return of all its property, including its confidential, proprietary and/or trade secret information from Defendants.

9.       USF further seeks an order directing the Defendants to account for the whereabouts of USF's confidential, proprietary and/or trade secret information and to produce for inspection all computers, smart phones, email accounts, and other media on which USF's property, including confidential, proprietary and/or trade secret information may currently reside or on which such information was previously stored.  While USF has been irreparably harmed, USF also seeks all of the damages it has suffered as a result of the Defendants' actions and USF's efforts to recover and protect its confidential, proprietary and/or trade secret information, and its customer and employee relationships.

10.       It is clear that the Individual Defendants do not intend to abide by their contractual and legal obligations to USF without Court intervention.  The Individual Defendants also ignored USF's efforts to have them voluntarily abide by their legal obligations by failing to respond to cease and desist letters and other reminders from USF.  To date, the Individual Defendants are in possession of USF's property, including its confidential, proprietary, and/or

4

trade secret information and they have refused to return it.

11.     USF brings this action, among other things, to protect its property, including its confidential, proprietary, and/or trade secret information, to protect its workforce from unlawful raiding (including inducing or attempting to induce USF employees to breach their contractual obligations with USF,  and to seek redress from the irreparable harm that the Defendants' wrongful conduct has caused and will continue to cause USF to suffer.

## PARTIES

12.     Plaintiff USF is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Rosemont, Illinois.

13.     Defendant BiRite is a California corporation, with its principal place of business in Brisbane, California.  BiRite is a direct competitor of USF.

14.     Defendant Wendt is a California citizen domiciled in Danville, California.  Wendt was employed by USF from approximately September 20, 2004 until his abrupt resignation on or about January 25, 2014.  At the time of Wendt's departure from USF, he served as a DSM in USF's San Francisco Division.  Defendant Wendt is now employed by BiRite in substantially the same position he previously held with USF.

15.     Defendant Conley is a California citizen domiciled in Antioch, California. Conley was employed by USF from approximately April 13, 2009 until his abrupt resignation on or about January 25, 2014.  At the time of Conley's departure from USF, he served as a TM in USF's San Francisco Division.  Defendant Conley is now employed by BiRite in substantially the same position he previously held with USF.

16.     Defendant Kennedy is a California citizen domiciled in Manteca, California. Kennedy was employed by USF from approximately August 26, 2003 until his abrupt

resignation on or about January 25, 2014. At the time of Kennedy's departure from USF, he served as a TM in USF's San Francisco Division. Defendant Kennedy is now employed by BiRite in substantially the same position he previously held with USF.

17.     Defendant Hughes is a California citizen domiciled in San Francisco, California. Hughes was employed by USF from approximately August 9, 1999 until his abrupt resignation on or about February 28, 2014. At the time of Hughes' departure from USF, he served as a TM in USF's San Francisco Division. Defendant Hughes is now employed by BiRite in substantially the same position he previously held with USF.

18.     Defendant Mosqueira is a California citizen domiciled in Brentwood, California. Mosqueira was employed by USF from approximately March 6, 2000 until his abrupt resignation on or about February 28, 2014. At the time of Mosqueira's departure from USF, he served as a TM in USF's San Francisco Division. Defendant Mosqueira is now employed by BiRite in substantially the same position he previously held with USF.

19.     Defendant Powell is a California citizen domiciled in San Francisco, California. Powell was employed by USF from approximately June 26, 2006 until his abrupt resignation on or about February 28, 2014. At the time of Powell's departure from USF, he served as a TM in USF's San Francisco Division. Defendant Powell is now employed by BiRite in substantially the same position he previously held with USF.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this action under 28 U.S.C. § 1332 because the parties are citizens of different states (USF is a Delaware corporation with its principal place of business in Illinois, the Individual Defendants are California citizens, and BiRite is a California citizen) and the matter in controversy exceeds $75,000 excluding interest and costs.

21.     This Court has personal jurisdiction over the Defendants, and venue is proper in this District under 28 U.S.C. § 1391(a) because the Defendants committed and continue to commit tortious acts in and/or related to this State.  In addition, the Individual Defendants entered into Non-Solicitation and Non-Disclosure Agreements with USF agreeing to personal jurisdiction in Illinois.  Further, BiRite knew, at all relevant times, that USF's employees were bound by Non-Solicitation and Non-Disclosure Agreements, and that they had agreed to personal jurisdiction in Illinois, and BiRite is therefore bound by the same forum selection.  Finally, USF's principal place of business is in Illinois, it regularly conducts business in Illinois, and the harm from Defendants' conduct as alleged herein is felt in Illinois and has harmed USF in Illinois.

## EVENTS GIVING RISE TO THIS ACTION

**I.      USF'S BUSINESS, AND ITS CONFIDENTIAL, PROPRIETARY AND/OR TRADE SECRET INFORMATION**

22.     USF is one of the nation's premier foodservice distributors, offering more than 350,000 national brand products and its own high-quality private label items, ranging from meats and produce to frozen foods.  USF provides the finest quality food and related products to more than 250,000 customers, including independent restaurants, government operations, healthcare and hospitality entities, educational institutions and prominent multi-unit restaurant companies.

23.     USF's business includes subsidiaries and business units offering high-quality food products, supplies, and equipment.  For example, USF's Stock Yards business unit offers operators and consumers high-quality products, including Certified Angus Beef and other premium product offerings.

24.     Nationally, USF employs approximately 25,000 people in more than 60 locations. USF continually seeks to provide the best products, value, and service to its customers.

25.     USF enjoys longstanding relationships with customers that have many local and national locations and accounts.  USF has successfully established and maintained both local (also known as "street") and national customer accounts by offering the highest quality and value services and products.

26.     USF's success in the highly competitive food distribution business is a result of decades of hard work and ingenuity.  USF's confidential, proprietary, and trade secret information, and its employee and customer relationships, are the lifeblood of its business. USF's business is profitable by virtue of its strategic structuring and implementation of cost methodologies, margins, discounts, and pricing, all of which are maintained by the company as highly confidential and are not generally known in the public domain.

27.     USF's senior sales, business development, and marketing personnel are successful by virtue of their access to USF's confidential pricing, discounts, allowances, margins, and cost information, and contribute to the same.  Certain confidential product pricing and margin information is provided in confidence to USF's field sales personnel to allow them to competitively service, and provide the best value to USF's customers.

28.     USF's TMs are the face of USF.  Their job duties focus on building and maintaining successful customer relationships.  The TMs become familiar with each customer's particularized needs, including, for example, the specific types and brands of food products they require for their respective businesses, and then work with a network of suppliers and vendors to service those needs.

29.     USF has invested substantial money and resources in structuring and operating its business to provide high-quality product and service offerings to its customers at the best possible value.

30.     USF also spends extensive time and substantial money identifying and maintaining key customer relationships, designing customer initiatives, determining strategic acquisitions, allocating resources for new technologies and initiatives, and creating annual business and marketing plans.

31.     USF has developed and maintained valuable relationships and substantial goodwill with its customers.

32.     USF's business information, including its confidential, proprietary and/or trade secret information, customer relationships and goodwill, are of paramount significance to its business reputation and its success.

33.     USF's trade secrets include its product costs, margins, discounts, pricing strategies and similar information stored in password-protected files on USF's computer systems.

34.     USF's trade secret information is not generally known in the industry and is valuable because USF derives economic value from the information not being publicly available.

35.     USF's trade secret business and customer information is of great value to USF and such information would give any competitor who improperly acquired such information an unfair competitive advantage by, among other things: (a) not having to expend the time and resources to develop the trade secret information as USF has done; (b) allowing a competitor to quickly develop strategies, marketing plans, products and services to unfairly compete with USF in order to diminish USF's competitive advantage; and (c) alerting a competitor to initiatives that should not be pursued.

36.     USF protects its trade secret business and customer information by, among other safeguards: requiring employees to keep confidential business and customer information confidential; password protecting computers; limiting access to information; requiring

9

employees to sign non-solicitation and non-disclosure and computer access and use agreements; and requiring employees to acknowledge receipt of, and agreement to comply with USF's Code of Conduct (which includes the obligation to protect USF's trade secret information).

**II.    THE INDIVIDUAL DEFENDANTS' EMPLOYMENT WITH USF AND THEIR AGREEMENTS TO PROTECT USF'S PROPRIETARY, CONFIDENTIAL AND/OR TRADE SECRET INFORMATION AND TO NOT SOLICIT USF EMPLOYEES AND CUSTOMERS**

37.     In return for valuable consideration, the Individual Defendants entered into Non-Solicitation and Non-Disclosure Agreements with USF.  The consideration received amounted to monetary compensation, including but not limited to the ability to participate in USF's Points of Focus program (which provides monetary benefits), and receiving access to new USF confidential, proprietary and/or trade secret information.  The Individual Defendants also agreed that their work product would be USF's sole property.

38.     After accepting the Non-Solicitation and Non-Disclosure Agreements, the Individual Defendants were provided access to USF's confidential, proprietary and/or trade secret information (including new information), subject to USF's Non-Solicitation and Non-Disclosure Agreements.  True and correct copies of the Individual Defendants' applicable respective Non-Solicitation and Non-Disclosure Agreements are collectively attached hereto as Exhibit "A."

39.     The Non-Solicitation and Non-Disclosure Agreements contain a provision whereby the Individual Defendants agree not to directly or indirectly use any of USF's Confidential Information after termination of employment, or during employment other than as required for the performance of their job duties and as authorized by USF:

**3.      Non-Disclosure of Confidential Information.**

(a)     At no time, either during or after the termination of employment, shall Employee directly or indirectly obtain, disclose or use for Employee or any

Person, or aid others in obtaining, disclosing or using any Confidential Information of the Company, other than as may be required in the performance of duties for and as authorized by the Company. All Confidential Information is and shall remain the sole property of the Company. The Company understands that under the current laws of certain states, restrictions on the use or disclosure of confidential information must be of a finite duration. Accordingly, the parties agree that should the law of such a state be applied to this Agreement, the restrictions on the use or disclosure of Confidential Information that is not a trade secret (the restriction on the use or disclosure of which shall be unlimited by time) shall apply only for a period of two (2) years from the termination of Employee's employment with the Company, which period Employee acknowledges to be reasonable under the circumstances at the time of execution of the Agreement…

40.      The Non-Solicitation and Non-Disclosure Agreements define "Confidential Information" at Section 2(e) as:

"Confidential Information" means any information (in whatever form and whether or not recorded in any media) relating to the Business of the Company (whether constituting a trade secret or not) and including, but not limited to, customer and vendor lists or other documents containing the names and/or job titles and telephone numbers of the principal contact(s) of each customer and/or vendor; customer and vendor documents, routing arrangements, files, purchases and account history; vendor information; route lists of sales employees; pricing, margins, sales allowances, discounts, incentives and pricing strategies and policies; invoices; procurement strategies and pricing; marketing and product information; order guides or histories; sales data for any employee, product, customer or territory; sales and delivery schedules; credit terms, policies and information, including invoicing and payment records; information on customer or vendor preferences; promotional programs; financial information of the Company or its customers or vendors; the terms, conditions and structures of the Company's contracts and agreements with customers, vendors and suppliers; information pertaining to the company's methods of operation, processes, strategies and techniques, including strategies for identifying and satisfying the needs of specific customers and types of customers; and lists containing personal and personnel information about other employees of the company, including but not limited to their home and business telephone, mobile and pager numbers, addresses, compensation terms, customers served by and vendors assigned to such employees, and job performance…

41.      The Non-Solicitation and Non-Disclosure Agreements also contain a provision whereby the Individual Defendants agree to return to USF all USF property and confidential information upon termination of their employment:

4.    **Return of Company Property and Confidential Information.**

All records, files, customer order guides, pricelists, photo/videographic materials, computers and computer related equipment (e.g. hardware, software, disks, electronic storage devices, etc.), cell phones, smart phones, Blackberries, personal data assistants, keys, equipment, access cards, passwords, access codes, badges, credit cards or other tangible material, and all other documents, including but not limited to Confidential Information, Employee receives, acquires, produces or has access to as a result of his or her employment with the Company (regardless of the medium in which any information is stored) (collectively "Property"), are the exclusive property of the Company.   Upon the termination of Employee's employment, Employee shall return to the Company all Property of the Company and all copies thereof in Employee's possession or control.

42.    The Non-Solicitation and Non-Disclosure Agreements also contain a provision whereby the Individual Defendants agree not to directly or indirectly use or disclose trade secrets to solicit certain customers within one year following termination of their employment with USF:

5.    **Non-Solicitation of Restricted Customers.**

(a)    For the one (1) year period following the termination of Employee's employment with the Company, Employee shall not directly or indirectly, (for Employee or any other Person, whether as an employee, owner, consultant, independent contractor, or in any other capacity), for the purpose of providing products or services competitive with those conducted, authorized, offered or provided by the Company, use or disclose trade secrets in order to solicit, market, service, contact, sell to or attempt to sell to any Person(s):

(1)    to whom Employee sold products or services on behalf of the Company at any time during the Pre-Termination Period, including sales performed while Employee was in training or providing vacation or leave coverage for another Associate; or

(2)    to whom the Company sold products or services and with whom Employee had contact on behalf of the Company in connection with such sale at any time during the Pre-Termination Period; or

(3)    to whom the Company sold products or services at any time during the Pre-Termination Period and which sale was made through any Associate whom Employee directly or indirectly managed or supervised (at any level of management or supervision); or

12

(4)     with regard to whom, at any time during the Pre-Termination Period, Employee (or any Associate whom Employee directly or indirectly managed or supervised, at any level of management or supervision): (i) participated in the preparation of a written sales proposal or bid containing Confidential Information to such Person on behalf of the Company; (ii) participated in the setting of prices, margins, or credit terms for such Person(s) on behalf of the Company; or (iii) used or received or created or reviewed any Confidential Information relating to such Person(s) on behalf of the Company; or

(5)     who is, or functions as, a food broker or contract management company or group purchasing organization or otherwise represents one or more customers or negotiates on their behalf, and to whom or through whom Employee or any Associate whom Employee directly or indirectly managed or supervised (at any level of management or supervision) sold products or services on behalf of the Company at any time during the Pre-Termination Period.

(b)     For the one (1 ) year period following the termination of Employee's employment with the Company, Employee shall not, directly or indirectly, (for Employee or any other Person, whether as an employee, owner, consultant, independent contractor, or in any other capacity), for the purpose of providing products or services competitive with those conducted, authorized, offered, or provided by the Company, use or disclose trade secrets in order to solicit, market, service, contact, sell to or attempt to sell to any Person who is controlled by or who controls the Person(s) identified in Section 5(a). A "Restricted Customer" is that and are those Person(s) identified in Section 5(a) and 5(b) herein.

(c)     Examples of indirect solicitation, marketing, servicing, contacting, selling to or attempting to sell to, include but are not limited to, providing Confidential Information to a Person(s) regarding a Restricted Customer; advising or encouraging a Restricted Customer to reduce or cease doing business with the Company or to do business with a Person that provides products or services competitive with the Company; switching or swapping sales, solicitation, or service responsibility for a Restricted Customer with an employee of a Person that is competitive with the Company; participating in the supervision or management of any Person or employee of such Person, regardless of other intervening levels of management or supervision, with regard to a Restricted Customer; participating in the setting of prices, credit terms or margins for a Restricted Customer; participating in developing and executing marketing and sales strategies and decisions affecting a Restricted Customer; and receiving any personal benefit (present or future) in the event a Restricted Customer should do any business with a Person.

43. The Non-Solicitation and Non-Disclosure Agreements also contain a provision whereby the Individual Defendants agree not to directly or indirectly solicit USF employees within one year following termination of the Individual Defendants' employment with USF:

**6.      Non-Solicitation of Company Employees.**

For a period of one (1) year following Employee's termination of employment with the Company, Employee will not, directly or indirectly, on behalf Employee or for any other Person, entice, induce, encourage or solicit or attempt to entice, induce, encourage or solicit any individual then employed by the Company and with whom the Employee had work-related dealings as a co-employee of the Company to leave such employment with the Company (this provision is not intended to restrict communications addressed to the general public, such as advertising to fill open positions).

44. The Individual Defendants further agreed that the Non-Solicitation and Non-Disclosure Agreements were governed by Illinois law[2] and that the exclusive venue and forum for any litigation arising out of or relating to the Non-Solicitation and Non-Disclosure Agreements would be the state or federal courts of Illinois, and consented to personal jurisdiction in Illinois:

This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois without applying its conflicts of laws principles. The exclusive venue for any litigation between Employee and Company based upon any fact, matter or claim arising out of or relating to this Agreement shall be the state or federal courts located in Chicago, Illinois, and Employee hereby consents to any such court's exercise of personal jurisdiction over him/her for such purpose.

45. In addition, the Individual Defendants were subject to USF's policies prohibiting unauthorized use or disclosure of USF confidential information. The Individual Defendants' Acknowledgement of Receipt of USF's Employee Handbook are collectively attached hereto as Exhibit B. In relevant part, the Individual Defendants agreed to abide by the following policies:

---

[2]      Defendant Conley's Non-Solicitation and Non-Disclosure Agreement is the only one which states that it is to be governed by Delaware law.

neither while employed by the Company nor at any time thereafter [] may you ***directly or indirectly disclose, reveal, or use for yourself or others any confidential or proprietary information of the Company without prior written permission of the Company***, other than in the performance of your duties for the Company . . . May 2008 Associate Handbook at 33, November 2011 Employee Handbook at 38 (emphasis added).

4.      You may ***remove confidential material*** (both hard copy and soft copy) from the office ***only when you have a legitimate business purpose*** for doing so. May 2008 Associate Handbook at 34, November 2011 Employee Handbook at 39 (emphasis added).  (emphasis added).

46.      Upon their resignation from USF, the Individual Defendants each received a letter enclosing their Non-Solicitation and Non-Disclosure Agreements, and reminding them of their continuing duties and obligations to USF thereunder.

## III.  THE INDIVIDUAL DEFENDANTS' BREACHES OF THE NON-SOLICITATION AND NON-DISCLOSURE AGREEMENTS, AND SOLICITATION OF USF CUSTOMERS ON BEHALF OF BiRite

47.      In the last two months, BiRite has solicited numerous USF employees and has hired at least six (6) former USF employees, including one (1) DSM, and five (5) TMs.  BiRite, by and through former USF employees improperly and unlawfully possessing and using USF confidential, proprietary and/or trade secret information, has also solicited numerous USF customers that the former USF employees served for USF up until their abrupt resignations.

48.      During the last few months, individuals formerly employed by USF and now employed by BiRite have engaged in a variety of wrongful and/or suspicious conduct, including but not limited to as described below: (1) improperly acquiring, or retaining without authorization, USF's property, including its confidential, proprietary and/or trade secret information; (2) breaching their duty of loyalty to USF by, before leaving USF, suggesting to USF customers that they were leaving USF for BiRite and that customers should do business with BiRite; (3) breaching their duty of loyalty to USF by using USF's time and resources to

plan their move to BiRite, including preparations to take USF data and USF customers; (4) using USF confidential, proprietary and/or trade secret information to solicit USF customers to do business with BiRite; and/or (5) accessing USF confidential, proprietary and/or trade secret information shortly before leaving for BiRite.

## IV. DEFENDANT WENDT SOLICITED USF CUSTOMERS; IMPROPERLY EMAILED USF CONFIDENTIAL, PROPRIETARY AND/OR TRADE SECRET INFORMATION TO HIS PERSONAL EMAIL; DELETED USF'S CONFIDENTIAL INFORMATION; AND FAILED TO RETURN ALL USF PROPERTY UPON TERMINATION

49.     Defendant Wendt abruptly, and without notice, resigned from his position as DSM at USF on or about January 25, 2014.  USF is informed and believes that, Defendant Wendt had interviewed with BiRite some time prior to his resignation and had received an employment offer from BiRite, and is now employed by BiRite in substantially the same position he previously held with USF.

50.     While still employed by USF, Defendant Wendt told USF customers that he was leaving USF to go to BiRite, suggesting that they should go to BiRite as well.

51.     Defendant Wendt departed from USF under suspicious circumstances.  On the same day that he resigned, two (2) TMs that worked directly under him, Defendants Conley and Kennedy, also resigned from USF.  All three of them tendered their resignations, effective immediately without any notice that would allow USF to transition their respective duties and customers in an orderly fashion.

52.     On December 19, 2013, before he resigned from USF, Defendant Wendt, without authorization from USF, began to e-mail USF documents containing USF confidential, proprietary and/or trade secret information to his personal e-mail.  One such document was an internal commission summary report for Defendant Mosqueira.  This document identified every USF customer served by Mosqueira, provided internal sales-related information including

quantity, net sales, and gross profit, and corresponding commissions paid to Mosqueira for each customer. The e-mailed information would be extremely valuable to Defendant Wendt, and in turn his new competing employer, BiRite, in soliciting Mosqueira to resign from USF and join BiRite. It would arm BiRite with confidential information that would allow it to fashion an offer of employment and compensation that would exceed that which Mosqueira was receiving with USF.

53.     While he was still employed by USF, and armed with the information contained in the commission summary report he e-mailed to his personal e-mail account, Defendant Wendt solicited Defendant Mosqueira to join BiRite.

54.     Shortly before he left USF and joined BiRite, Defendant Wendt accessed documents on his computer containing USF confidential, proprietary, and/or trade secret information relating to USF customers, including proprietary details on specific products being purchased by specific USF customers and specific pricing, and destroyed/deleted those files in order to disrupt USF's ongoing service to those USF customers.

55.     Defendant Wendt has used USF confidential, proprietary and/or trade secret information to solicit multiple USF customers that he serviced at USF to do business with BiRite. Since Defendant Wendt left USF for BiRite, USF has lost between 40 to 60 percent of the business from these customers.

56.     Defendant Wendt has failed to return all USF's property, including confidential, proprietary and/or trade secret information to USF, in violation of his Non-Solicitation and Non-Disclosure Agreement, including but not limited to sensitive information pertaining to USF customers.

**V.    DEFENDANT CONLEY IMPROPERLY EMAILED USF CONFIDENTIAL, PROPRIETARY AND/OR TRADE SECRET INFORMATION TO HIS PERSONAL EMAIL; IMPROPERLY SOLICITED USF'S CUSTOMERS, IMPROPERLY ACCESSED USF CONFIDENTIAL, PROPRIETARY AND/OR TRADE SECRET INFORMATION; AND FAILED TO RETURN ALL USF PROPERTY UPON TERMINATION**

57.    Defendant Conley resigned from his position as TM at USF on or about January 25, 2014.  USF is informed and believes that, Defendant Conley had interviewed with BiRite some time prior to his resignation and had received an employment offer from BiRite, and is now employed by BiRite in substantially the same position he previously held with USF.

58.    Shortly before he left USF and joined BiRite, Defendant Conley accessed documents on his computer containing USF confidential, proprietary and/or trade secret information relating to USF employees.  In particular, in the weeks preceding his abrupt resignation from USF, Defendant Conley accessed and printed several documents containing USF confidential, proprietary, and/or trade secret information that would be extremely valuable to a competitor, like BiRite, in soliciting USF's sales force.  With this information, a competitor, like BiRite, could target and recruit USF's most successful sales associates in order to displace USF from customer accounts those sales associates serviced at USF.

59.    Defendant Conley has used USF confidential, proprietary and/or trade secret information to solicit multiple USF customers that he serviced at USF to do business with BiRite.  Within days of his abrupt resignation, Defendant Conley was taking an order from a USF customer on behalf of BiRite.  Since Defendant Conley left USF for BiRite, USF has lost nearly all business from at least four (4) USF customers to BiRite, whom Conley serviced up until his abrupt resignation from USF.  Since Conley's resignation on January 25, 2014 and through the end of March, USF has lost sales in excess of $70,000.

60.     Defendant Conley has failed to return all USF's property, including documents containing confidential, proprietary and/or trade secret information to USF, in violation of his Non-Solicitation and Non-Disclosure Agreement, including but not limited to sensitive information pertaining to USF customers.

**VI.     DEFENDANT KENNEDY SOLICITED USF CUSTOMERS TO LEAVE USF AND INSTEAD DO BUSINESS WITH BIRITE; MISAPPROPRIATED USF CONFIDENTIAL, PROPRIETARY AND/OR TRADE SECRET INFORMATION; AND FAILED TO RETURN ALL USF PROPERTY UPON TERMINATION**

61.     Defendant Kennedy abruptly, and without notice, resigned from his position as TM at USF on or about January 24, 2014 and went to work for BiRite.  USF is informed and believes that Defendant Kennedy had interviewed with BiRite some time prior to his resignation and had received an employment offer from BiRite, and is now employed by BiRite in substantially the same position he previously held with USF.

62.     Defendant Kennedy has used USF confidential, proprietary and/or trade secret information to solicit multiple USF customers that he serviced at USF to do business with BiRite.  Kennedy has in fact embarked on a campaign to systematically solicit on behalf of BiRite the very same customers he previously serviced as a USF sales representative, using USF confidential, proprietary, and/or trade secret information.  At several customer locations, USF has encountered Defendant Kennedy, either alone or with another BiRite employee, showing up at the same time as, or within minutes before or after the USF representative, thereby demonstrating that Defendant Kennedy knew the exact time that the customer would need to place orders, which could only be obtained through USF's confidential call schedules and routing itineraries.

63.     Since Defendant Kennedy left USF for BiRite, USF has lost, to BiRite nearly all business from at least nine (9) customers which Kennedy serviced up until his abrupt resignation

from USF. Since Kennedy's resignation on January 25, 2014 and through the end of March,

USF has lost sales in excess of $75,000.

64. Defendant Kennedy has failed to return all USF's property, including documents

containing confidential, proprietary and/or trade secret information to USF, in violation of his

Non-Solicitation and Non-Disclosure Agreement, including but not limited to sensitive

information pertaining to USF customers.

## VII. DEFENDANT HUGHES SOLICITED USF CUSTOMERS TO LEAVE USF AND INSTEAD DO BUSINESS WITH BIRITE; IMPROPERLY EMAILED USF CONFIDENTIAL, PROPRIETARY AND/OR TRADE SECRET INFORMATION TO HIS PERSONAL EMAIL; MISAPPROPRIATED USF CONFIDENTIAL, PROPRIETARY AND/OR TRADE SECRET INFORMATION; AND FAILED TO RETURN ALL USF PROPERTY UPON TERMINATION

65. Defendant Hughes abruptly, and without notice, resigned from his position as TM

at USF on or about February 28, 2014. USF is informed and believes that Defendant Hughes

had interviewed with BiRite some time prior to his resignation and had received an employment

offer from BiRite, and is now employed by BiRite in substantially the same position he

previously held with USF.

66. Before he resigned from USF, Defendant Hughes, without authorization from

USF, began to e-mail countless USF documents containing USF confidential, proprietary and/or

trade secret information to his personal e-mail. From approximately January 31, 2014 and

continuing with even greater frequency through the day before his abrupt resignation from USF,

Defendant Hughes e-mailed hundreds of USF documents containing USF confidential,

proprietary, and/or trade secret information to his personal e-mail concerning nearly every

customer he serviced on behalf of USF. These documents contained information concerning

customer specific bids, rebate information, order guides, and pricing information. The e-mailed

information would be extremely valuable to a competitor, like BiRite, in soliciting USF's customers.

67.     Before he resigned from USF, Defendant Hughes worked in concert with Defendant Mosqueira to misappropriate USF's confidential, proprietary, and/or trade secret information.  During the weeks leading up to his resignation, Defendant Hughes asked Defendant Mosqueira to obtain product usage reports for several USF customers that Defendant Mosqueira was serving on behalf of USF.  These product usage reports contained proprietary information on specific products being purchased by specific USF customers and specific pricing.  Once Defendant Mosqueira obtained these reports, he sent them to Defendant Hughes' personal e-mail.  Ultimately, the USF customers for which these product usage reports pertained stopped purchasing from USF and began buying from BiRite immediately upon Defendant Mosqueira and Defendant Hughes' departure from USF.

68.     Defendant Hughes has used USF confidential, proprietary and/or trade secret information to solicit multiple USF customers that he serviced at USF to do business with BiRite.  Immediately following Hughes' resignation, USF sent various sales representatives, including its Sales Manager and TMs to fill the vacuum created by Hughes' departure and attend to the customers and accounts he previously serviced.  These employees were to inform the affected customers that their USF representative had resigned, that a new USF sales representative would continue to provide the products they needed and the same level of customer support through the ordering process.

69.     As USF representatives met with these customers, USF began to learn that Hughes had in fact embarked on a campaign to systematically solicit on behalf of BiRite the very same customers he previously serviced as a USF sales representative, using USF confidential,

proprietary, and/or trade secret information.  At several customer locations, USF encountered Defendant Hughes soliciting and/or taking orders on behalf of BiRite.  Since Defendant Hughes left USF for BiRite, USF has lost nearly all business from at least five (5) customers to BiRite, whom Hughes serviced up until his abrupt resignation from USF.  Since Hughes' resignation on February 28, 2014 and through the end of March, USF has lost sales in excess of $90,000.

70.	One USF customer account in particular, that was previously served by Defendant Hughes, stopped purchasing from USF, and took shipment of products from BiRite within three days of Defendant Hughes' resignation.  BiRite immediately engaged this customer without the need for any due diligence, against generally accepted industry standards, evidencing historical knowledge about this customer and advanced preparation.  Given the lack of capital reserves and ephemeral success that can often be attributed to restaurants, it is typical in the food service industry to conduct credit and similar background checks on a potential new customer, which can take several days or longer to finalize.

71.	Defendant Hughes also intentionally interfered with USF's relationship with its customers in an effort to unfairly and improperly solicit their business on behalf of BiRite.  Two (2) customer accounts previously served by Defendant Hughes on behalf of USF had placed orders for products on or before his resignation from USF.  Defendant Hughes deliberately and intentionally deleted these orders from USF's computers, causing the orders not to be shipped, dramatically impacting the customers' business and the business relationship with USF.

72.	Defendant Hughes has failed to return all USF's property, including documents containing confidential, proprietary and/or trade secret information to USF, in violation of his Non-Solicitation and Non-Disclosure Agreement, including but not limited to sensitive information pertaining to USF customers.

22

**VIII.** **DEFENDANT MOSQUEIRA SOLICITED USF CUSTOMERS TO LEAVE USF AND INSTEAD DO BUSINESS WITH BIRITE; IMPROPERLY EMAILED USF CONFIDENTIAL, PROPRIETARY AND/OR TRADE SECRET INFORMATION TO HIS PERSONAL EMAIL; MISAPPROPRIATED USF CONFIDENTIAL, PROPRIETARY AND/OR TRADE SECRET INFORMATION; AND FAILED TO RETURN ALL USF PROPERTY UPON TERMINATION**

73.     Defendant Mosqueira, abruptly and without notice, resigned from his position as TM at USF on or about February 28, 2014.  USF is informed and believes that, Defendant Mosqueira had interviewed with BiRite some time prior to his resignation and had received an employment offer from BiRite, and is now employed by BiRite in substantially the same position he previously held with USF.

74.     Before he resigned from USF, Defendant Mosqueira, without authorization from USF, began to e-mail countless USF documents containing USF confidential, proprietary and/or trade secret information to his personal e-mail.  From approximately January 31, 2014 and continuing with even greater frequency through the day before his abrupt resignation from USF, Defendant Mosqueira e-mailed hundreds of USF documents containing USF confidential, proprietary, and/or trade secret information to his personal e-mail concerning nearly every customer he serviced on behalf of USF.  These documents contained information concerning customer specific bids, rebate information, order guides, and pricing information.  The e-mailed information would be extremely valuable to a competitor, like BiRite, in soliciting USF's customers.

75.     Before he resigned from USF, Defendant Hughes worked in concert with Defendant Mosqueira to misappropriate USF's confidential, proprietary, and/or trade secret information.  Beginning as early as November 2013 and continuing through January 22, 2014, Defendant Mosqueira sent to Defendant Hughes' personal e-mail several USF documents containing confidential, proprietary, and/or trade secret information concerning four (4) specific

USF customers he served on behalf of USF. These documents included confidential finance/banking/credit information, and product usage reports for each USF customer. As Defendant Mosqueira served these customers on behalf of USF, there would be no legitimate reason for Defendant Hughes to request and receive these documents other than a coordinated effort to use USF's confidential, proprietary, and/or trade secret information to solicit USF customers on behalf of BiRite.

76.     Defendant Mosqueira has used USF confidential, proprietary and/or trade secret information to solicit multiple USF customers that he serviced at USF to do business with BiRite. Immediately following Mosqueira's resignation, USF sent various sales representatives, including its Sales Manager and TMs to fill the vacuum created by Mosqueira's departure and attend to the customers and accounts he previously serviced. These employees were to inform the affected customers that their USF representative had resigned, that a new USF sales representative would continue to provide the products they needed and the same level of customer support through the ordering process.

77.     As USF representatives met with these customers, USF began to learn that Mosqueira had in fact embarked on a campaign to systematically solicit on behalf of BiRite the very same customers he previously serviced as a USF sales representative, using USF confidential, proprietary, and/or trade secret information. At several customer locations, USF encountered Defendant Mosqueira soliciting and/or taking orders on behalf of BiRite. Since Defendant Mosqueira left USF for BiRite, USF has lost nearly all business from at least seven (7) USF customers to BiRite, whom Mosqueira serviced up until his abrupt resignation from USF. Since Mosqueira's resignation on February 28, 2014 and through the end of March, USF has lost sales in excess of $130,000.

24

78.     Defendant Mosqueira has failed to return all USF's property, including documents containing confidential, proprietary and/or trade secret information to USF, in violation of his Non-Solicitation and Non-Disclosure Agreement, including but not limited to sensitive information pertaining to USF customers.

## IX.     DEFENDANT POWELL SOLICITED USF CUSTOMERS TO LEAVE USF AND INSTEAD DO BUSINESS WITH BIRITE; MISAPPROPRIATED USF CONFIDENTIAL, PROPRIETARY AND/OR TRADE SECRET INFORMATION; FAILED TO RETURN ALL USF PROPERTY UPON TERMINATION

79.     Defendant Powell abruptly and without notice, resigned from his position as TM at USF on or about February 28, 2014.  USF is informed and believes that, Defendant Powell had interviewed with BiRite some time prior to his resignation and had received an employment offer from BiRite, and is now employed by BiRite in substantially the same position he previously held with USF.

80.     USF is informed and believes that Defendant Powell has used USF confidential, proprietary and/or trade secret information to solicit multiple USF customers that he serviced at USF to do business with BiRite.   Immediately following Powell's resignation, USF immediately sent various sales representatives, including its Sales Manager and TMs to fill the vacuum created by Powell's departure and attend to the customers and accounts he previously serviced. These employees were to inform the affected customers that their USF representative had resigned, that a new USF sales representative would continue to provide the products they needed and the same level of customer support through the ordering process.

81.     As USF representatives met with these customers, USF began to learn that Powell had in fact embarked on a campaign to systematically solicit on behalf of BiRite the very same customers he previously serviced as a USF sales representative, using USF confidential, proprietary, and/or trade secret information.  At several customer locations, USF encountered

Defendant Powell soliciting and/or taking orders on behalf of BiRite. Since Defendant Powell left USF for BiRite, USF has lost nearly all business from at least nine (9) USF customers to BiRite, whom Powell serviced up until his abrupt resignation from USF. Since Powell's resignation on February 28, 2014 and through the end of March, USF has lost sales in excess of $40,000.

82.     Three (3) USF customer accounts in particular, that were previously served by Defendant Powell, stopped purchasing from USF, and took shipment of products from BiRite within three days of Defendant Powell's resignation. BiRite immediately engaged this customer without any due diligence, against generally accepted industry standards, evidencing historical knowledge about this customer. Given the lack of capital reserves and ephemeral success that can often be attributed to restaurants, it is typical in the food service industry to conduct credit and similar background checks on a potential new customer, which could take several days or longer to finalize.

83.     Defendant Powell has failed to return all USF's property, including documents containing confidential, proprietary and/or trade secret information to USF, in violation of his Non-Solicitation and Non-Disclosure Agreement, including but not limited to sensitive information pertaining to USF customers.

## X.     BiRite Expressly Contemplated That USF Employees Would Misappropriate USF's Confidential, Proprietary, And/Or Trade Secret Information For Its Benefit

84.     The Individual Defendants' misappropriation and threatened misappropriation of USF's property, including its confidential, proprietary, and/or trade secret information prior to and while in the employ of BiRite was foreseen by BiRite. Indeed, the Individual Defendants were hired by BiRite to develop BiRite's business and solicit USF customers and USF

employees as part of BiRite's unlawful plan to acquire USF's business through unlawful means. At a minimum, BiRite recognized that the Individual Defendants would use USF's property, including its confidential, proprietary, and/or trade secret information, in their work for Bi-Rite and did not prevent it.

85.     As set forth in paragraphs 1 through 84 above, the Individual Defendants' unlawful activities, including their theft and use of USF's confidential, proprietary, and/or trade secret information, in preparation for their employment with BiRite and while in the employ of BiRite have been within the course and scope of their employment with BiRite; each unlawful act committed, including each act of theft and unauthorized use, disclosure or other misappropriation of USF's confidential, proprietary, and/or trade secret information was directly related to and an outgrowth of their work for BiRite and for their own personal benefit and gain.

## XI.     EFFECTS OF THE DEFENDANTS' ACTS

86.     With the Individual Defendants' departure, their knowledge of and access to USF's confidential, proprietary and/or trade secret information, their suspected and apparent use of USF's confidential, proprietary and/or trade secret information to solicit USF employees and customers to BiRite, USF is threatened with losing several millions of dollars in business and the loss of value of its goodwill, customer relationships, employee relationships, and confidential, proprietary and/or trade secret information, which cannot be adequately addressed at law.

87.     By virtue of their positions with BiRite, the Individual Defendants will undoubtedly attempt to continue to solicit USF's customers using USF's property, including its confidential, proprietary and/or trade secret information.

88.     The Individual Defendants are causing, threatening to cause, and/or will continue to cause or threaten to cause, significant irreparable harm to USF, including the loss of value of confidential, proprietary and/or trade secret information, the loss of or damage to long-standing

customer and employee relationships, loss of goodwill, as well as damage to USF's reputation as an industry leader and its ability to successfully market its goods and services. Money alone cannot make USF whole and USF continues to be irreparably harmed.

## COUNT ONE
### Breach of Contract: Non-Solicitation Of Restricted Customers Covenant
#### (against Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, and Powell)

89.     USF restates and incorporates by reference those allegations set forth in paragraphs 1 through 88 above, as if set forth fully herein.

90.     The Individual Defendants' obligations under the Non-Solicitation and Non-Disclosure Agreements are reasonable in terms of duration and activities restricted and do not impose a greater restraint than is necessary to protect USF's legitimate business interests.

91.     In violation of the Non-Solicitation and Non-Disclosure Agreements, using USF's confidential and/or trade secret information, Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, and Powell have solicited USF customers to leave USF and do business with BiRite instead.

92.     The Non-Solicitation and Non-Disclosure Agreements that the Individual Defendants executed constitute valid and enforceable agreements.

93.     USF performed all of the duties and obligations it agreed to and owed the Individual Defendants under the Non-Solicitation and Non-Disclosure Agreements.

94.     Under the Non-Solicitation and Non-Disclosure Agreements, the Individual Defendants agreed not to solicit, within one year of cessation of their employment with USF, certain of USF's customers using USF's trade secrets.

95.     As a direct and proximate cause of Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, and Kennedy's breaches of the Non-Solicitation and Non-Disclosure Agreements,

USF has been damaged and continues to be damaged in an amount to be determined at the trial of this case, but which is in excess of the minimum jurisdictional amount of this Court, including attorneys' fees and costs to the extent allowed by law.

96.     USF will suffer irreparable injury if the Individual Defendants are not enjoined from soliciting USF customers to leave USF and do business with BiRite in violation of the Non-Solicitation and Non-Disclosure Agreements with USF.  USF's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

## COUNT TWO
**Breach of Contract: Return of Company Property and Confidential Information Covenant**
**(against Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, and Powell)**

97.     USF restates and incorporates by reference those allegations set forth in paragraphs 1 through 88 above, as if set forth fully herein.

98.     The Individual Defendants' obligations under the Non-Solicitation and Non-Disclosure Agreements are reasonable in terms of duration and activities restricted and do not impose a greater restraint than is necessary to protect USF's legitimate business interests.

99.     The Non-Solicitation and Non-Disclosure Agreements that the Individual Defendants executed constitute valid and enforceable agreements.

100.     USF performed all of the duties and obligations it agreed to and owed the Individual Defendants under the Non-Solicitation and Non-Disclosure Agreements.

101.     Under the Non-Solicitation and Non-Disclosure Agreements, the Individual Defendants agreed to return all USF property and information upon cessation of their employment with USF.

102.    In violation of the Non-Solicitation and Non-Disclosure Agreements, Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, and Powell failed to return all USF property, including its confidential, proprietary, and/or trade secret information, following the cessation of their employment with USF.

103.    As a direct and proximate cause of Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, and Powell's breaches of the Non-Solicitation and Non-Disclosure Agreements, USF has been damaged and continues to be damaged in an amount to be determined at the trial of this case, but which is in excess of the minimum jurisdictional amount of this Court, including attorneys' fees and costs to the extent allowed by law.

104.    USF will suffer irreparable injury if the Individual Defendants are not compelled to return USF confidential, proprietary and/or trade secret information or other property of USF that the Individual Defendants unlawfully retained in violation of the Non-Solicitation and Non-Disclosure Agreements and applicable laws.  USF's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

## COUNT THREE
### Breach of Contract: Non-Disclosure of Confidential Information Covenant
### (against Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, and Powell)

105.    USF restates and incorporates by reference those allegations set forth in paragraphs 1 through 88 above, as if set forth fully herein.

106.    The Individual Defendants' obligations under the Non-Solicitation and Non-Disclosure Agreements are reasonable in terms of duration and activities restricted and do not impose a greater restraint than is necessary to protect USF's legitimate business interests.

30

107.     The Non-Solicitation and Non-Disclosure Agreements that the Individual Defendants executed constitute valid and enforceable agreements.

108.     USF performed all of the duties and obligations it agreed to and owed the Individual Defendants under the Non-Solicitation and Non-Disclosure Agreements.

109.     Under the Non-Solicitation and Non-Disclosure Agreements, the Individual Defendants agreed not to directly or indirectly divulge or make use of confidential information or trade secrets without obtaining prior written consent of USF.

110.     In violation of the Non-Solicitation and Non-Disclosure Agreements, Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, and Powell have directly or indirectly divulged or made use of confidential information or trade secrets without obtaining prior written consent of USF.

111.     As a direct and proximate cause of Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, and Powell's breaches of the Non-Solicitation and Non-Disclosure Agreements, USF has been damaged and continues to be damaged in an amount to be determined at the trial of this case, but which is in excess of the minimum jurisdictional amount of this Court, including attorneys' fees and costs to the extent allowed by law.

112.     Unless the Individual Defendants are permanently restrained from misappropriating USF's confidential, proprietary, and/or trade secret information, USF will continue to suffer immediate and irreparable harm.  USF's damages cannot be adequately compensated solely through money damages or other legal remedies, thereby entitling USF to equitable relief in the form of an injunction.

## COUNT FOUR
### Conversion
**(against Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, and Powell)**

113.    USF restates and incorporates by reference those allegations set forth in paragraphs 1 through 88 above, specifically excluding those allegations that specifically allege misappropriation of USF's confidential and/or trade secret information.

114.    USF specifically asserts that this conversion count does not involve the misappropriation of trade secret or confidential information, but rather specific identifiable USF property that was converted.

115.    Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, and Powell have removed, destroyed, misappropriated, and converted USF's property, without its consent or authorization, and converted it to their own use and/or the use of others.  Such converted property, includes, but is not limited to, the computerized files transferred to external computer drives and/or e-mail accounts, hard copy USF documents, and any other property of USF that they have retained following their termination from USF.

116.    USF has demanded the return of its property but Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, and Powell have not returned said property.

117.    Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, and Powell engaged in this conduct without USF's permission, consent, authorization, or authority.

118.    As a direct and proximate result of the Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, and Powell's conversion, USF has suffered, and will continue to suffer, damages in an amount to be proven at the time of trial, but which is in excess of the minimum jurisdictional amount of this Court.

119.    Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, and Powell's acts alleged herein were willful, wanton, malicious, and oppressive, and entitle USF to an award of exemplary and punitive damages against Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, and Powell.

**COUNT FIVE**
**Breach of Duty of Loyalty**
**(against Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, and Powell)**

120.    USF restates and incorporates by reference those allegations set forth in paragraphs 1 through 88 above, specifically excluding those allegations that specifically allege misappropriation of USF's confidential and/or trade secret information.

121.    USF specifically asserts that this breach of duty of loyalty count does not involve the misappropriation of trade secret or confidential information.

122.    While employed by USF, the Individual Defendants owed USF a duty of loyalty, faithful service, and regard for USF's interests.

123.    Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, and Powell breached their duty of loyalty to USF as a result of the acts alleged herein, including but not limited to: (1) obtaining without permission and without authorization USF's property that they intended to use during his employment with USF's competitor and with the intent to unfairly compete with USF during and after they left their employment with USF; (2) using USF's time and resources to plan their move to USF's competitor, including preparations to take USF data, USF employees, and USF customers; (3) using their employment position for their benefit and their future move to USF's competitor in their interactions with customers and employees; and/or (4) improperly soliciting USF employees before and/or after resigning from USF.

124.     Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, and Powell also breached their duty of loyalty by competing against USF and usurping USF's corporate opportunities while they were still employed by USF.

125.     As a direct and proximate result of Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, and Powell's breaches of their duty of loyalty, USF has been damaged and the Individual Defendants have gained and benefited and will continue to gain and benefit from their breach.

126.     As a direct and proximate result of Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, and Powell's breaches, USF has been damaged in an amount to be determined at the trial of this case, but which is in excess of the minimum jurisdictional amount of this case.

127.     Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, and Powell's  actions were malicious and willful and in conscious disregard of USF's rights.  Accordingly, USF is entitled to recover its actual damages and punitive damages, as well as its attorneys' fees and costs, in an amount to be determined at trial.

## COUNT SIX
### Violation of the Illinois Trade Secrets Act (765 ILCS § 1065 *et seq.*)
### (against Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, Powell, and BiRite)

128.     USF restates and incorporates by reference those allegations set forth in paragraphs 1 through 88 above, as if set forth fully herein.

129.     USF's trade secret information includes, *inter alia*, USF's confidential pricing, marketing plans, business plans, and business strategies, and customer information, including, but not limited to, customer lists, customer preferences, strategies for soliciting prospective customers, pricing, margins, promotions, advertising allowances, historical usage and

preferences, customer marketing data and purchasing patterns, applicable discounts and planned research and development for its customer base.

130.    This information constitutes trade secrets, pursuant to the Illinois Uniform Trade Secret Act, 765 ILCS § 1065/1, *et seq.*, because USF derives independent economic value from this information not being generally known to the public and not being readily ascertainable by proper means by other persons who could obtain economic value from its disclosure or use, and because the information is the subject of reasonable efforts to maintain its secrecy.

131.    Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, Powell, and BiRite have acquired USF trade secrets by improper means.

132.    Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, Powell, and BiRite have disclosed and/or used USF trade secrets without express or implied consent.

133.    At the time of disclosure or use of the USF's trade secrets, Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, Powell, and BiRite knew or had reason to know that their knowledge of the trade secrets was derived from or through a person who had utilized improper means to acquire them and/or that they were acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use.

134.    Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, Powell, and BiRite actually misappropriated, and/or threatens to misappropriate, USF's trade secrets without its consent, in violation of Illinois law.

135.    As a result of Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, Powell, and BiRite's conduct in violation of the Illinois Trade Secrets Act, USF has incurred damages, including attorneys' fees and costs to the extent allowed by law, in an amount to be determined at the trial of this case.

## COUNT SEVEN
### Tortious Interference with Prospective Economic Advantage
### (against Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, Powell, and BiRite)

136.    USF restates and incorporates by reference those allegations set forth in
paragraphs l through 88 above, specifically excluding those allegations that specifically allege
misappropriation of USF's confidential and/or trade secret information.

137.    USF specifically asserts that this tortious interference count does not involve the
misappropriation of trade secret or confidential information.

138.    USF has legitimate, existing and prospective economic relationships with
numerous customers and employees.

139.    Defendants have knowledge of these existing customer and employee
relationships.

140.    Defendants intended to harm USF by interfering with USF's relationships with its
customers and employees, and to unlawfully solicit USF's customers and employees to leave
USF and do business with BiRite, and also by acts of disloyalty described above calculated to
interfere with USF's relationships with customers and its employees, and its competitive
advantage.

141.    Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, Powell, and BiRite
have unlawfully interfered and continue to interfere with USF's relationships with its customers
and employees and to solicit customers to discontinue their business with USF and/or to
purchase from BiRite the same products or services that they previously purchased or are
currently purchasing from USF.

142.    Defendants' actions are without privilege or justification.

143.    As direct and proximate result of these actions, USF has suffered and continues to suffer harm and is entitled to recover damages against Defendants.

**COUNT EIGHT**
**Tortious Interference with Contractual and Business Relations**
**(against Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, Hughes, and BiRite)**

144.    USF restates and incorporates by reference those allegations set forth in paragraphs l through 88 above, specifically excluding those allegations that specifically allege misappropriation of USF's confidential and/or trade secret information.

145.    USF specifically asserts that this tortious interference count does not involve the misappropriation of trade secret or confidential information.

146.    USF has existing contractual relationships with its customers and the Individual Defendants whereby the Individual Defendants are obligated to refrain from soliciting USF's customers and employees and to refrain from using or disclosing USF's confidential, proprietary and/or trade secret information.  USF has existing contractual relationships with employees and customers that derive value to USF.  These contractual relationships constitute property interests entitled to protection from unjustified interference by USF's competitors or any other persons, including Defendants.

147.    Defendants Wendt, Conley, Kennedy, Hughes, Mosqueira, Powell, and BiRite intentionally and without justification have interfered and continue to interfere with USF's contractual relationships with its customers and employees by soliciting employees and customers to discontinue their business with USF and/or to purchase from BiRite the same products or services that they previously purchased or are currently purchasing from USF, and to breach their agreements with USF.

148.    Defendants' actions are without privilege or justification**.**

37

149.     As direct and proximate result of these actions, USF has suffered and continues to suffer harm and is entitled to recover damages against Defendants.

## COUNT NINE
### Conspiracy
### (against all Defendants)

150.     USF restates and incorporates by reference those allegations set forth in paragraphs l through 149 above, as if set forth fully herein.

151.     Defendants reached an agreement to accomplish an unlawful purpose and/or a lawful purpose by unlawful means.

152.     Defendants conspired by concerted action to misappropriate USF's confidential, proprietary and/or trade secret information, convert USF property, solicit USF's customers and/or employees, and/or interfere with USF's relationships with its customers, contractual or otherwise, and employees.

153.     Defendants had a meeting of the minds on this object or course of action and committed one or more overt acts to further the object or course of action.  These overt acts include, but are not limited to: (a) taking, without USF's express or implied consent, USF's confidential, proprietary and/or trade secret information; (b) misappropriating USF's confidential, proprietary and/or trade secret information; (c) converting USF's property; (d) inducing breaches of loyalty; and (e) soliciting USF's customers and employees though unlawful means.

154.     There is no adequate remedy at law for Defendants' conspiracy because it will inevitably influence the further course of development of BiRite's competing business at USF's expense.  USF seeks injunctive relief against this conduct.

155.     In the absence of injunctive relief enjoining Defendants from further conspiring against USF, USF will suffer irreparable harm for which there is no adequate remedy at law. USF seeks injunctive relief against this conduct.

156.     As direct and proximate result of these actions, USF has suffered and continues to suffer harm and is entitled to recover damages against Defendants.

## COUNT TEN
## <u>Unfair Competition</u>
### (against all Defendants)

157.     USF restates and incorporates by reference those allegations set forth in paragraphs l through 88 above, as if set forth fully herein, specifically excluding those allegations that specifically allege misappropriation of USF's confidential and/or trade secret information.

158.     USF specifically asserts that this unfair competition count does not involve the misappropriation of trade secret or confidential information.

159.     The Defendants undertook the foregoing acts to gain an unfair competitive advantage over USF.

160.     The Defendants willfully undertook the foregoing acts with knowledge of and disregard for USF's rights, and with the intention of causing harm to USF and benefiting themselves.

161.     USF is informed and believes that Defendants are unfairly competing in the marketplace.

162.     As a result of the Defendants' unfair competition by targeting USF customers and USF employees through unlawful means and methods, USF has been injured and faces irreparable injury.  USF is threatened with losing customers and goodwill in amounts which may

be impossible to determine, unless the Defendants are enjoined and restrained by order of this

Court.

## DEMAND FOR JURY

163.    USF demands a jury trial and has tendered the appropriate fee.

## PRAYER FOR RELIEF

WHEREFORE, USF seeks judgment in its favor and an Order granting the following

relief:

1.    A temporary restraining order[3] and preliminary and permanent injunction

compelling the Individual Defendants, their agents, and all those persons in active concert or

participation with the Individual Defendants to:

a.    Refrain from using or disclosing confidential or trade secret information to solicit any USF customers that they serviced at USF before they resigned;

b.    Immediately return to USF all USF property, including all confidential, proprietary and/or trade secret information, or other property belonging to USF in both hard copy and electronic form;

c.    Make available for inspection and imaging any computers, personal data devices, e-mail accounts, online storage, or electronic storage devices owned by, assigned to, or otherwise in the possession of the Individual Defendants at any time from January 1, 2014 to the present that may contain USF property;

d.    Identify to USF any and all customers or potential customers whom the Individual Defendants, or anyone acting on their behalf, have used confidential or trade secret information to solicit or otherwise contact since their terminations from USF, including the name of the customer, the date of the contact, and the method of communication;

e.    Refrain from any use or disclosure of USF's confidential, proprietary and/or trade secret information;

---

[3] USF seeks the temporary restraining order against defendants Hughes and Mosqueira.

      f.     Swear and account for all USF property, including all information removed, downloaded, transferred, printed, accessed or e-mailed from USF's computers or computer network;

      g.     Provide USF with authorization to obtain access to all telephone records, electronic records, files, cloud-based accounts, or e-mail accounts owned, used, or accessed by the Individual Defendants, and any DropBox accounts, except for any attorney-client privileged information or documents, that may contain USF property to ensure that USF's property has been returned;

      h.     Refrain from inducing or attempting to induce USF's employees or former employees to breach the terms of their Non-Solicitation and Non-Disclosures Agreements, including soliciting USF's current employees to leave their employment with USF;

      i.     Refrain from any spoliation of evidence; and

      j.     Submit to a compliance mechanism to ensure that USF's confidential, proprietary and/or trade secret information is intact and the Defendants are abiding by their contractual and legal obligations to USF, including continuing depositions and required affidavits from Defendants.

2.     A preliminary and permanent injunction ordering BiRite, their agents, and all those persons in active concert or participation with BiRite to:

      a.     Refrain from violating the provisions of the above preliminary and permanent injunctions;

      b.     Return to USF all confidential, proprietary and/or trade secret information or other property belonging to USF in both hard copy and electronic form;

      c.     Refrain from using, disclosing, or acquiring USF's confidential, proprietary and/or trade secret information; and

      d.     Refrain from interfering with USF's relationships with its customers and employees.

3.     That any preliminary or permanent injunction incorporate a tolling provision, whereby the protected periods specified in the Non-Solicitation and Non-Disclosure Agreements are tolled and extended for the length of time that the Court determines that the Individual Defendants violated the Non-Solicitation and Non-Disclosure Agreements;

41

4.      That Defendants be ordered to disgorge all improper benefits, profits, and/or gains;

5.      For an accounting of the misuses of USF's information and property and other unlawful acts;

6.      That USF be awarded compensatory damages to be proven at trial;

7.      That USF be awarded exemplary or punitive damages in an amount to be proven at trial;

8.      That USF be awarded its costs and attorneys' fees as permitted by statute or contract; and

9.      That the Court grant such further relief as it deems just.

Dated:  April 21, 2014               Respectfully submitted,

                                   **US FOODS, INC.**

                                   By:   /s/ Daniel Lanciloti
                                        One of Its Attorneys

Daniel Lanciloti
Marcus L. Mintz
Seyfarth Shaw LLP
131 South Dearborn Street, Suite 2400
Chicago, Illinois  60603
Telephone:  (312) 460-5000
Facsimile:  (312) 460-7000

Robert B. Milligan (*pro hac vice* application pending)
Eugene Suh (*pro hac vice* application pending)
Seyfarth Shaw LLP
2029 Century Park East, Suite 3500
Los Angeles, California 90067
Telephone: (310) 277-7200
Facsimile: (310) 201-5219

*Attorneys for Plaintiff US Foods, Inc.*